James W. MILTON, et al.,
Plaintiffs, Appellants,

v.

VAN DORN COMPANY,
Defendant, Appellee.

No. 91–1544.

United States Court of Appeals,
First Circuit.

Heard Nov. 5, 1991.

Decided April 14, 1992.

Stephen R. Delinsky with whom Treazure R. Johnson, Brian M. Martin and Eckert, Seamans, Cherin & Mellott, Boston, Mass., were on brief, for plaintiffs, appellants.

Charles L. Freed with whom James B. Niehaus, Thompson, Hine and Flory, Washington, D.C., Raymond J. Kenney, Jr., and Martin, Magnuson, McCarthy & Kenney, Boston, Mass., were on brief, for defendant, appellee.

Before BREYER, Chief Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

Plaintiffs-appellants, purchasers of the capital stock of Milton Can Company ("Milton Can") from defendant-appellee Van Dorn Company ("Van Dorn"), appeal from the summary judgment dismissing their complaint for common law fraud, federal securities fraud, and breach of the stock purchase agreement. We affirm.

I

BACKGROUND

A jury reasonably could have found the following facts from the summary judgment record. *See Price v. General Motors Corp.*, 931 F.2d 162, 164 (1st Cir.1991). In 1968, Van Dorn, an Ohio corporation which manufactures various product containers, acquired and merged with Milton Can, a New Jersey can manufacturing company owned and operated by the family of plaintiff James W. Milton. Even after the merger, however, the Milton family continued to manage the new Milton Division for Van Dorn.

In August 1986, James Milton, president of Milton Can since 1979 and a director of Van Dorn since 1984, learned that Davies Can, another wholly-owned Van Dorn division based in Cleveland, Ohio, was in the process of developing a "ringless" one-gallon paint can. Plaintiff Barry Treadwell, an officer of Milton Can, learned in June 1987 that Davies Can had shown a prototype of its new can to Glidden Company,

one of Van Dorn's existing customers. Glidden operated a major paint manufacturing facility in Reading, Pennsylvania, within the primary paint can marketing area served by Milton Can's New Jersey plant. Although both Davies Can and Milton Can had supplied Glidden's Reading facility with a limited number of one-gallon paint cans in the past, neither was a major supplier prior to 1988.

In September 1987, James Milton, as agent for the fourteen plaintiff-investors, commenced negotiations with Van Dorn for the purchase of all of the capital stock of Milton Can. In his preliminary discussions with Van Dorn's management, James Milton tentatively proposed that the stock purchase agreement ("SPA") contain, *inter alia*, (1) a "competitive restriction" which would prohibit Van Dorn from competing with Milton Can "within the[ir] presently established geographical areas," and (2) a "non-duplication" restriction which would prevent Van Dorn from constructing any manufacturing facilities, or duplicating any product lines, within Milton Can's "geographical operating area" until such time as plaintiffs had amortized their purchase money note to Van Dorn. Van Dorn consulted Davies Can's management, which categorically rejected both of James Milton's proposals. While Davies Can's outright rejection was not communicated to plaintiffs, James Milton allowed the proposals to lapse and neither the competitive restriction on marketing nor the "non-duplication" provision was included in the SPA.

On November 10, 1987, two days before a scheduled meeting of the Van Dorn Board of Directors ("Board") which was to have been attended by James Milton, Van Dorn decided to postpone a planned Board presentation by Davies Can aimed at obtaining Van Dorn's authorization to commence commercial production of its "ringless" can, as well as possible construction of additional paint can manufacturing facilities outside Ohio, specifically in Chicago, Dallas, or Los Angeles. Nonetheless, the Board approved further capital expenditures in the amount of $300,000 for continuing development, research, and fea-

sibility studies relating to the production of the "ringless" can.

In an acquisition financing proposal prepared by Paine Webber in January 1988, Milton Can's management forecast "a unique opportunity for a substantial increase in [projected] revenues in 1988 ... due to ... an improved marketing strategy targeted at new customer accounts and an increased penetration of existing accounts." The Paine Webber financing proposal identified Glidden as one of "the principal sources of this significant increase."

On February 11, 1988, while Van Dorn was negotiating the sale of the capital stock of Milton Can with James Milton, Davies Can proposed, *inter alia*, to construct a new one-gallon paint can manufacturing facility in eastern Pennsylvania provided Glidden would enter into an agreement to purchase the new "ringless" one-gallon paint cans to be produced there. Another presentation by Davies Can to the Van Dorn Board, originally scheduled for the end of February 1988, was postponed.

On March 31, 1988, Van Dorn and James Milton finalized the SPA, which transferred all Milton Can capital stock to the plaintiffs.[1] The SPA contained no reference to Davies Can's preliminary discussions with Glidden. James Milton's resignation as a Van Dorn director became effective the day of the closing. On June 14, 1988, Davies Can formally apprised the Van Dorn Board of its impending agreement to supply "ringless" one-gallon paint cans to Glidden, and of its proposed construction of a Georgia plant and a Pennsylvania plant to produce the cans to be supplied to Glidden. The written instrument whereby Davies Can agreed to supply Glidden with "ringless" one-gallon paint cans was executed on August 8, 1988. The Van Dorn Board immediately approved the agreement and authorized capital expenditures for the construction of two new plants.

The Board approved Atlanta, Georgia, as the site of the first new plant. Not until May 1989 did the Board approve eastern Pennsylvania as the site of the second new Davies Can manufacturing facility.

The fourteen plaintiffs filed a complaint in the United States District Court for the District of Massachusetts, alleging that Van Dorn's written and oral representations during the course of their negotiations for the sale of the capital stock of Milton Can misled plaintiffs reasonably to believe that neither Van Dorn nor its wholly-owned Davies Can Division had taken any actions, *prior to the sale of Milton Can's capital stock,* to duplicate either Van Dorn's or Davies Can's paint can manufacturing facilities within Milton Can's primary marketing area, which includes eastern Pennsylvania. Although plaintiffs concede that some customers within Milton Can's primary marketing area previously were supplied by Davies Can from its facility in Solon, Ohio, the complaint alleges that the proposal to construct the eastern Pennsylvania plant was material information which would have affected plaintiffs' investment decision. James Milton provided competent deposition testimony that geographic location is crucial in the can manufacturing business due to the high cost of transporting bulky cans and containers and that it is customary industry practice for paint can manufacturers to serve limited geographic markets.

The complaint asserted a securities fraud claim under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b–5, and state law claims for common law fraud and breach of contract.[2] The district court granted summary judgment in favor of Van Dorn on all counts. On the federal securities fraud and common law fraud counts, the court concluded that any impendent supply agreement between Glidden and Davies Can would be

---

**1.** At the same time, plaintiffs acquired Van Dorn's Eagle Can Division, located in Massachusetts. The Eagle Can acquisition is not implicated in the present appeal.

**2.** The parties agree that Massachusetts law applies to the common law fraud claim. *See Ma-*

*thewson Corp. v. Allied Marine Indus., Inc.,* 827 F.2d 850, 853 n. 3 (1st Cir.1987) ("express preference" of parties as to application of Massachusetts law accepted for purposes of appeal). The SPA prescribes the application of Ohio law to the claim for breach of contract.

"material" information, but that there was no duty to disclose the information to plaintiffs because Van Dorn never represented that it would disclose plans to compete after plaintiffs acquired Milton Can.[3] Finally, the district court determined that Van Dorn did not breach the SPA, since its unambiguous terms applied only to Van Dorn's pre-SPA operation of Milton Can, and not Van Dorn's actions in connection with its other divisions.

## II

## DISCUSSION

Plaintiffs contend that several SPA provisions contain broad language reasonably interpreted as a representation by Van Dorn that it would disclose to plaintiffs any pre-SPA proposal of the type here at issue: the proposal Davies Can made to Glidden in February 1988 to construct a one-gallon paint can manufacturing facility in eastern Pennsylvania. Specifically, plaintiffs cite Section 2.14(a) of the SPA, in which Van Dorn represented that it had taken no undisclosed action in the three months prior to the execution of the SPA which would result in "[a]ny change in the financial condition, earnings, book value, assets, business, operations or *prospects* of the [Milton Can] Division ... whether nor (sic) not arising in the ordinary course of business [which] has been *materially adverse* with respect to [Milton Can]." (emphasis added). Plaintiffs argue that Van Dorn, throughout their negotiations, continually represented, orally and in Section 2.30 of the SPA, that James Milton "knew more" than Van Dorn about Milton Can's business and that Van Dorn would limit its disclosures to any unilateral "actions" Van Dorn had taken "in connection with" Milton Can. Citing our decision in *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir.1990) (en banc), the district court held that these representations were unambiguous references to Van Dorn's actions in relation to *the internal operations of Milton Can* and that a jury could not reasonably conclude that Van Dorn had undertaken a "duty to disclose" any competitive actions taken by its other divisions.[4]

3. Van Dorn did not premise its motion for summary judgment relating to the fraud claims on any lack of duty to disclose, but on plaintiffs' failure to prove either scienter or materiality. Plaintiffs do not appeal from the summary judgment on the state law claim for unfair and deceptive labor practices under *Mass.Gen.L.* 93A, §§ 2, 11 (1984 & Supp.1991).

4. Rule 10b–5, promulgated under section 10(b) of the Securities Exchange Act of 1934, provides that, in connection with the purchase or sale of any security, "[i]t shall be unlawful for any person, directly or indirectly ... [t]o make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading...." Rule 10b–5 implies a private cause of action for damages on the part of securities purchasers and sellers injured by its violation. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 380–81 n. 10, 103 S.Ct. 683, 686 n. 10, 74 L.Ed.2d 548 (1983); *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 24 (1st Cir.1987) (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730, 95 S.Ct. 1917, 1923, 44 L.Ed.2d 539 (1975)). Where the complaint alleges a material omission, rather than an outright misstatement, "[t]he materiality of the information claimed not to have been disclosed ... is not enough to make out a sustainable claim of securities fraud. Even if the information is material, there is no liability under Rule 10b–5 unless there was a *duty to disclose* it." *Backman v. Polaroid Corp.*, 910 F.2d 10, 13 (1st Cir.1990) (emphasis added) ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5." (citing *Chiarella v. United States*, 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980))). *See Jackvony v. RIHT Financial Corp.*, 873 F.2d 411, 417 (1st Cir.1989); *Roeder*, 814 F.2d at 26; *see also Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 987 n. 17 99 L.Ed.2d 194 (1988). A duty to disclose may arise, for example, where the defendant volunteers disclosure and the law implies the corollary duty to refrain from incomplete, inaccurate, or misleading disclosures. *See Backman*, 910 F.2d at 12.

Under Massachusetts common law, "there can be no actionable claim of fraud for failure to disclose in the absence of a duty to disclose." *Royal Business Group, Inc. v. Realist, Inc.*, 933 F.2d 1056, 1064 (1st Cir.1991) (applying Massachusetts law); *Nei v. Burley*, 388 Mass. 307, 446 N.E.2d 674, 676 (1983). Similarly, plaintiffs' breach of contract claim is premised on an express warranty in the SPA that, "[t]o the best knowledge of [Van Dorn], *no representation or warranty* of [Van Dorn] contained in this Agreement, and no statement contained in any certificate, Exhibit, list or writing furnished to Buyer in connection with this transaction, *contains any untrue statement* of a material fact neces-

We need not decide whether the contract language relied on by the plaintiffs is reasonably susceptible of their interpretation. Rather, assuming *arguendo* that a jury reasonably could conclude that Van Dorn had undertaken a duty to disclose any actions which might have a materially adverse effect on Milton Can's "prospects," we are in any event persuaded, as a matter of law, based on a careful review of the entire summary judgment record, that the proposal Davies Can made to Glidden in February 1988 was not "material" information.

■ On *de novo* review, we will determine that "[s]ummary judgment [was] warranted where the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine [dispute of material fact] and the moving party was entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c)." *Siegal v. American Honda Motor Co.*, 921 F.2d 15, 17 (1st Cir.1990). The moving party is entitled to judgment as a matter of law if the nonmoving party does not adduce enough evidence to permit a reasonable trier of fact to find for the nonmoving party on any element essential to its claim. *Id.* (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1985); *Brennan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir.1989)). The party with the burden of proof must produce more than a "scintilla of evidence" on each element essential to its claim, thus affording the jury a nonconjectural basis for concluding that "the fact to be inferred [is] more probable than its nonexistence." *Malave–Felix v. Volvo Car Corp.*, 946 F.2d 967, 970–71 (1st Cir.1991) ("mere scintilla of evidence" not sufficient to forestall directed verdict); *see Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512 (mere scintilla of evidence insufficient at summary judgment or directed verdict); *Lubanski v. Coleco Indus., Inc.*, 929 F.2d 42, 49 (1st Cir.1991) (same); *Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1088 (1st Cir.1989) (same). In our view, plaintiffs have failed to adduce

sary in order to make the statements contained herein or therein not misleading." (emphasis

enough evidence to sustain their burden of proof as to an element essential to each of their claims, namely, the materiality of the undisclosed information. *See, e.g., Jackvony v. RIHT Financial Corp.*, 873 F.2d 411, 415 (1st Cir.1989) (undisclosed information held not "material" as a matter of law).

The materiality of the undisclosed information is an element essential to recovery on the fraud counts. *See, e.g., Holmes v. Bateson*, 583 F.2d 542, 551 (1st Cir.1978) (rule 10b–5 claim requires proof of scienter, a *material* omission or misrepresentation by defendant, and plaintiffs' reliance and due diligence); *Nei*, 446 N.E.2d at 676 (Massachusetts law based on Restatement (Second) of Torts §§ 550, 551, requiring that undisclosed information be "material"). As to the breach of contract claim, Van Dorn warranted only that it would disclose any "actions" which would be *"materially* adverse" to Milton Can's "prospects." We can discern no reason to presume that plaintiffs would have negotiated or contracted for the disclosure of information deemed nonmaterial for securities fraud claim purposes. In the present circumstances, therefore, the materiality analysis controls all three claims.

■ The mere fact that an investor might find information interesting or desirable is not sufficient to satisfy the materiality requirement. Rather, information is "material" only if its disclosure would alter the *"total mix"* of facts available to the investor and "if there is a *substantial likelihood* that a reasonable shareholder would consider it important" to the investment decision. *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)) (emphasis added); *see Roeder*, 814 F.2d at 25–26; *cf. Cook v. Avien, Inc.*, 573 F.2d 685, 693 (1st Cir.1978) (analogous "materiality" standard under § 12(2) of 1933 Act). If an alleged omission involves *speculative* judg-

added).

ments about future events, such as those implicated by the SPA's use of the term "prospects," materiality "will depend at any given time upon a balancing of both the *indicated probability* that the event will occur and the *anticipated magnitude of the event* in light of the totality of the company activity." *Basic,* 485 U.S. at 238, 108 S.Ct. at 987 (citing *SEC v. Texas Gulf Sulfur Co.,* 401 F.2d 833, 849 (2d Cir.1968)) (emphasis added). Although "[t]he [objective] determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of [undisputed] facts and the significance of those inferences to him and those assessments are peculiarly ones for the trier of fact," *TSC Indus., Inc.,* 426 U.S. at 450, 96 S.Ct. at 2133, summary judgment is warranted, nonetheless, if reasonable minds could not differ as to the materiality of the undisclosed information. *See Berg v. First American Bankshares, Inc.,* 796 F.2d 489, 495 (D.C.Cir.1986).

Even if a trialworthy issue were shown to exist as to whether Van Dorn considered it probable that the Davies Can-Glidden discussions in February 1988 would reach fruition,[5] the summary judgment record is devoid of objective evidence that Milton Can's "prospects," as of the execution of the SPA in March 1988, depended in any material way on its future sales of *one-gallon* paint cans to Glidden, or that a reasonable shareholder, in the circumstances, would consider whatever inferences might fairly be drawn from the Davies Can-Glidden pre-SPA discussions "significant." *See TSC Indus., Inc.,* 426 U.S. at 450, 96 S.Ct. at 2133. As plaintiffs bore

the burden of proving the *"anticipated magnitude"* of the impact of a Davies Can-Glidden agreement on Milton Can's financial "prospects," they were required to demonstrate a trialworthy issue as to whether it would have been reasonable to anticipate, *in March 1988,* that finalization of the proposed agreement would have deprived Milton Can of enough *anticipated* one-gallon paint can sales to Glidden's Reading facility that there was "a substantial likelihood that a reasonable shareholder would consider it important" to their investment decision. *Basic,* 485 U.S. at 231, 108 S.Ct. at 983.

The only evidence plaintiffs presented on the *"anticipated* magnitude" issue was James Milton's August 1990 deposition testimony that he anticipated that Glidden's account would be a principal source of increased revenues for Milton Can in 1988 and that he expected the increase would include an unspecified number of one-gallon can sales. James Milton's affidavit states that the bases for these "projections were *incorporated* in the acquisition financing proposal prepared by Paine Webber dated January 1988." (emphasis added). Although the "Marketing Strategy" section of the Paine Webber financing proposal projects a $1 million sales increase in 1988 over the 1987 Glidden sales account, nowhere is the $1 million figure broken down into particular product categories. Moreover, the "Marketing Strategy" section neither references nor contains any concrete historical or current basis or indication that *any* portion of the projected $1 million dollar Glidden sales increase would relate to *one-gallon* can sales, the only

---

**5.** Moreover, we recognize the tentative nature of Davies Can's discussions with Glidden in February 1988. As a general rule, the mere fact that an agreement has not yet been *finalized* will not be considered dispositive of the probability of achieving final agreement. *See, e.g., Basic,* 485 U.S. 224, 236, 108 S.Ct. 978, 986, 99 L.Ed.2d 194 (1988) (rejecting bright-line test that makes information regarding preliminary merger discussions "material" only when parties have reached agreement in principle); *cf. Roeder,* 814 F.2d at 25 (rejecting argument that information regarding alleged payment of bribes by corporate management may be "material" only *after indictment* of wrongdoers). In *Jackvony,* how-

ever, we discussed the limitations necessarily implied by the *Basic* decision; that is, the court must separate out "actions" with sufficient potential for fruition to warrant trial by jury, from the type of "tentative feelers" indicative of those fairly routine but "vague expressions of interest" that commonly occur in the business dealings of large companies. *Jackvony,* 873 F.2d at 415. At a minimum, Van Dorn's "actions" verge perilously close to the *Basic* line. Since we assume, for present purposes, that the "actions" referenced in the SPA encompassed Davies Can's initial discussions with Glidden, we do not rest our decision on the "probability" prong of the "materiality" test.

Milton Can product at all material to the present discussion. Instead, the text immediately following the Paine Webber proposal projections for 1988 conspicuously notes that "[i]n mid–1987, Glidden began purchasing *quart and half-pint* containers from Milton Can Company instead of Continental Can."

In the light of four undisputed historical facts, plaintiffs' failure to identify, let alone substantiate, a current or historical basis for ascribing *some* significant portion of the projected $1 million dollar sales increase to *one-gallon* paint can sales conclusively disposes of the ultimate inquiry whether plaintiffs have demonstrated a trialworthy issue as to the *"anticipated* magnitude"* element of their claims. First, Glidden was not among Milton Can's top twenty customers in 1987 (optimally accounting for less than 3% of Milton Can's *total product* sales). Second, Milton Can made only small, sporadic sales of one-gallon paint cans to Glidden before March 1988. Third, Glidden's Reading plant obtained most of its pre–1988 one-gallon can requirements from American Can and Crown Cork & Seal Companies, two of Milton Can's neighboring competitors. Fourth, Glidden's management never suggested to James Milton that Glidden was interested in purchasing more one-gallon cans from Milton Can. It seems eminently reasonable to expect that the Paine Webber proposal, principally based on information provided by James Milton and designed to facilitate the financing of plaintiffs' purchase of Milton Can's capital stock, would not omit material changes in Milton Can's prior course of dealing with an important customer, especially auspicious changes of a significant nature.

**6.** The Paine Webber proposal speaks to the "several market niches" open to Milton Can, all of which involved specialty cans either for coffee, tea, motor oil, or fish.

**7.** Although James Milton estimated that Van Dorn's failure to disclose the pre-SPA Davies Can–Glidden negotiations resulted in a $4 million loss to plaintiffs, he was unable to offer any substantiation or analysis to support the estimate, which he had not yet reduced to writing by the time he was deposed in August of 1990.

The Paine Webber proposal likewise indicates that the plaintiffs anticipated that most, if not all, of the projected $1 million increase would derive from Milton Can's *quart and half-pint can* sales, not from one-gallon can sales. First, in its "Products and Markets" section, the Paine Webber proposal notes:

> [S]everal container companies have discontinued the manufacture of many of the lower value "specialty cans" *concentrating on the higher volume one gallon paint can business.* This focus on higher volume paint cans by major producers has hurt industry-wide profit margins, but has left *increasingly profitable market niches for Milton Can.* (emphasis added).

The quoted statement indicates that Milton Can anticipated that its economic advantage during the immediate post-SPA period would be served by shifting its sales focus away from increasing dependence on the one-gallon paint can market, to the more profitable market for smaller paint cans and specialty cans.[6] Second, Milton Can's *company-wide* projections for increases in one-gallon paint can sales were substantially less optimistic than its projected increases in half-pint can sales:

|  | 1986 | 1987 | 1988E |
|---|---|---|---|
| Gallon paint | 22,914 | 23,439 | 27,316 |
| Half pint | 4,986 | 7,586 | 14,756 |

Although half-pint can sales in 1988 were expected to increase 95% over 1987, the anticipated increase in one-gallon can sales was 17%. Immediately following these projections, the Paine Webber proposal categorically states that "[t]he increase in half-pint cans from 1987 to 1988 is primarily due to the increased demand for such cans by the Rust–Oleum and *Glidden accounts."* (emphasis added).[7] Given the

It is difficult to escape the inference that Milton encountered insurmountable difficulties in explaining or justifying any projection of significant loss, even with the benefit of hindsight. The summary judgment record contains evidence of subsequent events which would have made Milton's task formidable. One month after the March 1988 closing, Milton Can sold two small shipments of one-gallon cans to Glidden's plant at Reading. As of August 1990, Milton Can was selling no one-gallon cans to Glidden's

paucity of objective evidence, James Milton's unsubstantiated surmise is too fragile and conclusory to sustain plaintiffs' burden of proving that the near-term financial impact which would result from the fruition of a Davies Can-Glidden agreement reasonably would have been anticipated, in March 1988, to be of sufficient magnitude to give rise to a substantial likelihood that plaintiffs' investment decision would have been affected.

The absence of objective evidence of "materiality" becomes more apparent in the context of the "total mix" of facts available to plaintiffs in advance of the SPA. James Milton knew about Davies Can's ringless can project well in advance of the SPA. Indeed, at the Van Dorn Board meeting in November 1987, approximately one week *after* James Milton made the "non-duplication" proposal, Milton himself voted to authorize further funding for the development of the ringless can. In addition, Barry Treadwell knew that Davies Can had shown a prototype of its ringless one-gallon can to Glidden's management not later than June 1987. Moreover, Davies Can was identified in the Paine Webber proposal as one of Milton Can's "major competitors." Notwithstanding this "ominous" information, James Milton, while still a Van Dorn director, never requested more information about the ringless can project either before or after he voted in favor of its further development. Finally, asked why he did not pursue his "non-duplication" proposal with Van Dorn, James Milton repeatedly stated that the proposal "didn't make a great deal of difference to me" and that "it never was a demand anyway." Similarly, Milton explained his decision to allow the "non-duplication of facilities and product lines" proposal to lapse, by stating: "I didn't consider it that important anyway."

We are unable to reconcile these admissions by plaintiffs' agent with their contention that Van Dorn's nondisclosure of Davies Can's proposal to build a one-gallon paint can manufacturing plant in eastern Pennsylvania was "materially adverse,"

Reading facility, even though Davies Can's east-

that is, of sufficient "anticipated magnitude" that it could give rise to a substantial likelihood that their decision to invest in Milton Can would be affected. Without objective evidence to substantiate James Milton's unexplained surmise as to the reasonableness of the *anticipated* magnitude of the impact of the Davies Can-Glidden proposal on Milton Can, and considering the countervailing objective evidence, as well as the inherently contradictory nature of James Milton's statements, we are convinced that a reasonable jury could not find from the competent evidence in the summary judgment record that the anticipated magnitude of any impact from the fruition of the Davies Can–Glidden negotiations would be "materially adverse." We therefore conclude, as a matter of law, that the undisclosed information was not "material."

*The district court judgment is affirmed.*

ern Pennsylvania plant had yet to come on line.