23 F.3d 394
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
Paul G. GAY, Plaintiff, Appellant,
v.
Robert P. AXLINE, Jr., et al., Defendants, Appellees.
 No. 93-1491
 United States Court of Appeals,
First Circuit.
 April 26, 1994.
 
 APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. A. David Mazzone, Senior U.S. District Judge ]
 Gerald H. Abrams for appellant.
 Steven E. Kramer for appellees.
 D.Mass.
 AFFIRMED.
 Before Torruella, Circuit Judge, Coffin, Senior Circuit Judge, and Boudin, Circuit Judge.
 COFFIN, Senior Circuit Judge.
 
 
 1
 In late 1990, plaintiff Paul Gay, founder and president of Plastic Card Systems, Inc., sold his stock in the company to the defendants, who are PCSI's other officers and directors. In this securities action, he alleges that the defendants intentionally failed to disclose a substantial business prospect for PCSI, causing him to sell his stock for substantially less than its real value. The district court, following a bench trial, found no violation of law. We affirm.
 
 I. Background
 
 2
 Paul Gay founded PCSI in 1987 and initially was its sole shareholder, director and officer. Defendant Robert Axline joined the company, which distributes thermal printing machines for an Austrian manufacturer,[1] as a fifty percent shareholder and chief executive officer the next year. When the other defendants became shareholders in 1990, Gay and Axline each retained 38.5 percent ownership.
 
 
 3
 In late 1988, PCSI collaborated with FIMA S.p.A., an Italian company, to form FIMA USA, Inc. (FIMA USA). Gay and Axline each owned 20 percent of FIMA USA, and FIMA S.p.A. owned 60 percent. Axline became president of FIMA USA and Gay became executive vice president. FIMA USA distributed plastic cards, personalization equipment for credit cards, and other plastic card and metal plate devices, as well as equipment for producing such cards. The company served as exclusive marketing agent for PCSI's line of thermal printers, and also marketed a line of embossing machines for FIMA S.p.A. PCSI and FIMA USA shared the same premises.
 
 
 4
 In mid-1990, FIMA S.p.A. ordered Gay's termination as an officer and director of FIMA USA. Gay remained, however, the president, a director, and the controlling shareholder of PCSI. He became entitled to vote the majority of the PCSI shares until all debt owed by PCSI to him and all debt owed by Axline to PCSI was paid in full. After his termination from FIMA USA, Gay went to the office only irregularly and, following a birthday party for him on October 29, he did not return.
 
 
 5
 A few days after the party, Gay initiated discussions with Axline about ending their PCSI relationship. Axline originally offered to sell his PCSI shares to Gay for about $50,000, their approximate book value at the time as calculated by Gay with assistance from PCSI's accountant. The company's assets consisted virtually entirely of 36 thermal printing machines. It had no employees, and neither Gay nor Axline placed any value on possible projects that were in various stages of discussion. In the course of negotiations, Gay and Axline changed buying/selling positions and, on about December 12, they agreed that Gay would receive a total of $50,000 consideration for his shares ($42,000 in book value and $8,000 in loan forgiveness). A closing on this deal took place on December 20, 1990.
 
 
 6
 Meanwhile, on November 30, 1990, an inactive FIMA USA distributor, Dave Campbell, had called the company asking for the use of a PCSI machine for a demonstration for a possible sale in Mexico. In subsequent phone calls early in December, Campbell explained that a Kodak affiliate in Mexico was bidding on a project involving plastic voter identification cards. At Campbell's request, Axline provided a letter detailing FIMA USA's financial condition and experience with ID cards. FIMA USA sent Campbell a machine for the demonstration, and a technician who regularly worked as an independent contractor on PCSI machines also traveled to Mexico on December 9 to assist. Campbell had offered to pay for this technical support.
 
 
 7
 The original indication from Campbell was that the Mexico project would involve the purchase of 17 or 18 machines. The number increased to 48 by December 4, and eventually grew to 82. Although Axline remained in contact with Campbell through December, he testified that he gave little consideration to the project because it seemed an unlikely prospect. The specifications called for processes outside the capability of the PCSI machines, Kodak was competing with several other contractors for the job, and PCSI was competing as subcontractor with a large company (DataCard) whose technology was considered superior to its own.
 
 
 8
 The nature of FIMA USA and PCSI's involvement with the Mexico project changed at the end of December, when Campbell dropped out as an intermediary and Axline began direct contact with Kodak. On two occasions in early January, Axline and another FIMA USA officer, Peter Kline, met with Kodak officials in Rochester. After the second meeting, which was held on January 10, FIMA USA informed its Austrian supplier of the possibility of a large sale. A contract was signed between Kodak and the Mexican government on January 14, and defendants testified that they were informed on January 22 of the Mexican government's intent to order 82 PCSI machines. The equipment was shipped between February and April.
 
 
 9
 Gay subsequently filed this securities action, alleging that the defendants' failure to tell him about the Mexican project before the stock closing violated various state and federal laws, including Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), and SEC Rule 10b-5. He claims that, if defendants had disclosed the deal, he would have waited to sell his stock, and would have received substantially more for it.
 
 
 10
 The district court denied a motion for summary judgment filed by defendants because an affidavit from a former PCSI employee, Sobieski, suggested that defendants deliberately withheld from Gay all information about the Mexican project. In a footnote to its pretrial order, however, the court noted that, "[a]s stated in Court on January 26, 1993 [the date of the unrecorded summary judgment hearing], the facts as stated in the defendant's motion for summary judgment are deemed admitted except as specifically controverted by the plaintiff." In the court's view, all that remained to be resolved was the affiant's credibility, which would lead to a finding of who knew what, and when, regarding the Mexican project.
 
 
 11
 Following a non-jury trial, the court found that the Mexican project was in such a preliminary stage at the time of the closing that it was not "material" information that defendants had an obligation to disclose under either Rule 10b-5 or state fiduciary duty standards. The court found incredible Sobieski's testimony that defendants took measures to conceal the project from Gay. It therefore granted judgment for defendants on all claims.
 
 
 12
 On appeal, Gay asserts that the district court's judgment suffers from both procedural and substantive defects. First, he argues that the district court improperly considered affidavits and depositions that were submitted in connection with the summary judgment motion but were not admitted into evidence at trial. Second, he contends that the district court improperly resolved factual disputes at the summary judgment hearing, and erred in excluding those issues from the trial. Finally, Gay contests the district court's determination that defendants violated neither federal securities law nor state fiduciary duty standards.
 
 II. Procedural Matters
 
 13
 Gay claims that the district court mishandled this case in two ways. In our view, these asserted problems, even if error, neither undermine the court's decision nor require extended discussion.
 
 
 14
 A. Depositions and Affidavits.
 
 
 15
 The district court stated in its opinion that, in reaching its decision, it had considered depositions and "the uncontroverted portions of affidavits" that were submitted in support of defendants' motion for summary judgment. Gay complains that these materials were not admitted into evidence at trial, that they constituted inadmissible hearsay, and that the court's reliance on them therefore was reversible error.
 
 
 16
 Gay accepts, however, that an appellate court will not reverse a trial court in a non-jury case based on the admission of incompetent evidence unless it appears from the record that the court relied upon that evidence to make an essential finding that otherwise would not have been made. See generally Hampton School Dist. v. Dobrowolski, 976 F.2d 48, 52-53 (1st Cir. 1992) (district court judgment will not be reversed for technical errors that do not affect substantial rights of the parties); DaSilva v. American Brands, Inc., 845 F.2d 356, 363 (1st Cir. 1988) (retrial not required when erroneous findings are not prejudicial). Gay identifies only a single deposition and a limited series of findings as problematic.
 
 
 17
 Scott Pomerantz, the head of the Mexican project for Kodak, was deposed but did not testify at trial. The district court's opinion included the following statements about FIMA USA's prospects early in January:
 
 
 18
 Pomerantz had not made any decision as to who would supply the machines if Kodak were awarded the contract. Kodak was competing with at least two other prime contractors, and FIMA USA was competing with another subcontractor, DataCard Corporation, a very large competitor with technology considered more suitable for the project.
 
 
 19
 Gay contends that these were "critical findings relating to the state of mind of Kodak and Pomerantz," that they evidently were drawn from Pomerantz' inadmissible deposition, and that they unfairly led the court to conclude that PCSI was unlikely to obtain the Kodak subcontract.
 
 
 20
 Whether or not the district court considered Pomerantz' deposition in making these findings is immaterial because testimony elicited at trial warranted the same inferences. Axline testified that, at the time he and Kline traveled to Rochester on January 2, 1990, they knew that they were competing with DataCard. He stated that he saw DataCard equipment at the Kodak facility, and was told by Kodak officials that they still were considering DataCard.
 
 
 21
 Kline also testified that the Rochester trip on January 2 was for the purpose of demonstrating that the PCSI machine could perform as well as DataCard's, which apparently was preferred at that time because it was believed to have better printing quality. Because Pomerantz was the person with whom Axline and Kline dealt in Rochester, the court properly could find based on their testimony that Pomerantz had not yet decided which company would supply the machines if Kodak won the Mexican contract.
 
 
 22
 Thus, regardless of the propriety of the court's reliance on summary judgment depositions and affidavits-and we make no ruling on that issue-no reversible error occurred. The only findings that Gay identifies as crucial were otherwise proven through admissible evidence.
 
 2. Disputed facts at summary judgment
 
 23
 As noted earlier, see supra at 5, the district court's pretrial order stated that all facts contained in defendants' motion for summary judgment and not specifically controverted would be deemed admitted. The court, however, did not list any particular facts as already determined. At the opening of trial, the court observed that the proceeding was being held "to conclude the fact finding," and indicated that the remaining factual dispute concerned Sobieski's testimony; specifically, was Sobieski telling the truth in charging that the defendants concealed the Mexico project from Gay knowing that it was a lucrative opportunity for PCSI.[2]
 
 
 24
 Gay claims that, in confining the trial to Sobieski's credibility, the district court essentially found disputed facts on the motion for summary judgment, thus improperly denying him a full hearing on his claims. He points to three issues that he believes were improperly found at the summary judgment stage:
 
 
 25
 *DataCard remained in contention to supply the machines for the Mexican project until mid-January 1991;
 
 
 26
 *the project was unlikely for FIMA USA and PCSI because the specifications included processes outside the capability of the PCSI machines; and
 
 
 27
 *pricing information was first submitted to Kodak's Mexico affiliate on January 16, 1991.
 
 
 28
 We think it unnecessary to explore the proper boundaries of the district court's authority to resolve these issues following the summary judgment hearing because any such findings were revisited fully at trial,[3] and Gay was given ample opportunity to disprove them. During the course of the two-day proceeding, the district court heard extensive testimony about all aspects of the Mexican deal from the principals of FIMA USA and PCSI, as well as from the plaintiff and his witnesses. Each of the three points raised as crucial by Gay was addressed.[4]
 
 
 29
 We already have noted evidence identifying DataCard as a competitor of PCSI's through at least the beginning of January. See supra at 7-8. Whether that status continued for another week or so is of no consequence, since the crucial point of reference is the December 20th closing. As for the date pricing information was provided to Kodak, the district court heard ample testimony explaining that the pricing originally was done through the distributor Campbell and that FIMA USA first submitted a price list directly to Kodak on January 16th or 17th. Axline's testimony at trial also permitted the district court to find that, regardless of the capability of the PCSI machines to meet the specifications of the Mexican project as they ultimately were defined, FIMA USA's principals initially felt the deal was beyond their range because PCSI's equipment could not accommodate the Mexican government's desire to include a photograph on the voter ID card.
 
 
 30
 In sum, the district court allowed the parties wide scope in presenting evidence at trial notwithstanding its limited articulation of the issues that remained to be resolved. We have no basis for concluding that the court made its factfinding prematurely on any significant issues. Moreover, at no time following issuance of the amended pretrial order did Gay meaningfully seek reconsideration or clarification of the court's ruling.[5] Certainly in these circumstances there was no reversible error in the court's procedure.
 
 III. Securities Claim
 
 31
 To prevail with a claim under section 10(b) of the Securities and Exchange Act, and associated Rule 10b-5, a plaintiff must prove scienter, a material omission or misrepresentation by the defendant, reliance and due diligence. See Milton v. Van Dorn Co., 961 F.2d 965, 969 (1st Cir. 1992); Holmes v. Batson, 583 F.2d 542, 551 (1st Cir. 1978). The district court in this case reached only the material omission element. It concluded that the information about the Mexican project known by the defendants at the time of Gay's December 20th stock closing was not material and that, consequently, their failure to disclose it was not actionable.
 
 
 32
 Gay argues that the evidence unequivocally demonstrated that the information was material, and he attributes the court's erroneous conclusion at least in part to its mistaken view of certain critical facts. We agree that the court's opinion reflects two relevant factual mistakes, see infra at 14, and we consequently have reviewed the record and the court's opinion with particular care. We believe that neither error, nor both in combination, is sufficiently crucial to undermine the court's finding on materiality.
 
 
 33
 The standard used in our circuit for determining whether undisclosed information is material follows the formulation set out by the Supreme Court in TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976): "whether there is 'a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of a reasonable shareholder,' " SEC v. McDonald, 699 F.2d 47, 49 (1st Cir. 1983). See Milton, 961 F.2d at 969. As we recently emphasized, not every piece of relevant information will be deemed material:
 
 
 34
 The mere fact that an investor might find information interesting or desirable is not sufficient to satisfy the materiality requirement. Rather, information is "material" only if its disclosure would alter the "total mix" of facts available to the investor and "if there is a substantial likelihood that a reasonable shareholder would consider it important" to the investment decision.
 
 
 35
 Milton, 961 F.2d at 969 (emphasis omitted).
 
 
 36
 We further have recognized that if an alleged omission involves "speculative judgments about future events," id. (emphasis omitted), materiality will depend upon "a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity," id. (emphasis in original). See also McDonald, 699 F.2d at 50. In other words, the fact that discussion has begun about a project with a potentially substantial impact on a company's stock price ordinarily would not be material if the likelihood of its happening were extremely remote.
 
 
 37
 The district court concluded that the defendants were not required to inform Gay about the Mexican project because, at the time of the closing, the deal was "extremely uncertain and contingent in nature." The court noted that both "the anticipated magnitude of the sale and the probability that it would occur were both small as of December 20." The court also deemed significant Gay's lack of interest in other pending PCSI projects of which he was aware. It observed that Gay consciously placed no value on these business opportunities in the negotiations.
 
 
 38
 The district court's analysis suffers from two factual flaws. First, its statement that the anticipated magnitude of the Mexican project as of December 20 was small does not square with the undisputed evidence that the number of machines needed had swelled to 48 by early December. This number exceeded PCSI's inventory. Because the inventory constituted virtually all of PCSI's assets, the Mexican project's potential impact on the company's value fairly could be described only as substantial once the deal encompassed all of the remaining machines.
 
 
 39
 Second, in noting Gay's lack of interest in other ongoing PCSI business dealings, the court singled out a project for American Express. In fact, PCSI was not involved in that project. The American Express deal was the subject of testimony at trial because it was a significant opportunity for FIMA USA, but it would have had no effect on PCSI's value.
 
 
 40
 In our view, these errors are not fatal to the district court's materiality analysis, which rested much more heavily on the uncertain nature of the Mexican project than on its scope. That the court erroneously described the project as small may chip the foundation of its analysis, but the weight of the probability finding prevents its collapse. See infra at 16-17. The mistaken reference to the American Express project likewise has limited impact. The court cited Gay's failure to inquire about the progress of that deal as illustrative of his general attitude toward various ongoing business dealings involving PCSI. Although Gay argues that the American Express project was unique because it was so developed and had great potential (and thus was more similar to the Mexican deal), the district court did not single out the American Express deal on that basis. It described American Express as "one of several other projects during the pre-closing period which were more advanced and more likely to bear fruit." The finding for which the district court used the American Express project-that Gay valued his PCSI stock based solely on its equipment inventory-remains supported even without American Express. See infra at 18.
 
 
 41
 Having concluded that the court's errors do not require reversal of its judgment, we now turn to a more complete review of its determination that defendants did not violate section 10(b) in failing to disclose what they knew about the Mexican project before the December 20th closing. Our review, of course, is only for clear error. See Crellin Technologies, Inc. v. Equipmentlease Corp., No. 93-1615, slip op. at 13-15 (1st Cir. March 8, 1994) (findings in a bench trial are reviewed with "considerable solicitude"); Gamma Audio & Video, Inc. v. Ean-Chea, 11 F.3d 1106, 1111 (1st Cir. 1993) (factual findings and mixed questions of fact and law both reviewed under clearly erroneous standard).
 
 
 42
 As indicated above, the district court based its materiality ruling on two primary determinations-that the probability of the sale was small as of December 20th and that Gay had demonstrated a lack of interest in prospective PCSI projects. Neither of these can be termed clearly erroneous.
 
 
 43
 The Mexican project first came to PCSI's attention in the phone call from Campbell, the distributor, on November 30th. By the time of the closing, three weeks later, the following events had occurred: Michael Rochette, an independent contractor who worked on PCSI machines, had traveled to Mexico at Campbell's request and expense to participate, with other competitors, in a demonstration for the Mexican government; also at Campbell's request, Axline had faxed a letter containing financial and other background information about FIMA USA to Mexico; Axline had been in regular contact with Campbell, from both Campbell's home base in Canada and from Mexico, throughout December; the number of machines at stake in the project had increased from an original estimate of 17 or 18 to at least 48.
 
 
 44
 There is no evidence that, during this period, Axline or any other defendant was given reason to believe that FIMA USA had more than a remote chance of obtaining the Mexican business. The demonstration in which Rochette participated on about December 10th included three different Kodak proposals (only one involving PCSI machines) as well as efforts by two other companies. Not only did Axline and others testify that they believed the PCSI machines could not perform the work, but there also was skepticism about Campbell's ability to land a deal in Mexico from his base in Canada. See, e.g., Testimony of Frank Gubello, national service manager for FIMA USA, Tr. II, at 88-89 ("It sounded kind of fishy to me.... [I]t just didn't sound like it was going to come off."). Axline testified that FIMA USA's activity in December simply was routine effort to support a dealer: "It was just another one of those things that come in on a regular basis which you work on.... We gave it very limited potential. In fact, [we] didn't think much about it."
 
 
 45
 Nothing cited by the plaintiff, with the exception of Sobieski's affidavit and testimony, contradicts the defendants' assertion that the deal appeared to be no more than a long shot until early January, after Axline and Kline's visits to Rochester. The district court found Sobieski's testimony to be "inherently implausible," and we will not second-guess this credibility judgment. See Gamma Audio & Video, Inc., 11 F.3d at 1115 ("It is established beyond cavil that the trial judge is in the best position to assess the credibility of witnesses...."). The district court's summary of the evidence on probability is therefore uncontradicted: "What little contact the defendants had with the project prior to December 20 was merely in the nature of an inquiry by a distributor and a demonstration of machines which had, as far as these defendants were concerned, very little chance of ripening into a sale."
 
 
 46
 Gay claims that the court improperly ignored the imminence of the Mexican government's decision on a contractor, and argues that the court should have recognized that a reasonable investor would have held his stock pending the decision. Although the advantage of hindsight gives this assertion some appeal, the court's supportable conclusion was that there was nothing of substance to wait for as of December 20th. Had the closing been ten days later, after the direct contact between FIMA USA and Kodak, Gay's point would be more compelling, even with no other evidence of FIMA USA's chances of winning the subcontract. At that stage, unlike on December 20th, there was a basis for viewing FIMA USA and PCSI's relationship with the project as more than just a distributor's inquiry.[6]
 
 
 47
 The court's assessment of materiality also was informed by evidence demonstrating Gay's lack of interest in other pending PCSI projects. Although he remained president of PCSI until he sold his stock, Gay stopped coming to the office after October 29 because he felt uncomfortable being in an office where everyone else was employed by FIMA USA. At no time did he ask the status of any of the "development ideas and projects" in which he knew PCSI had a hand at the time he and Axline began to discuss a stock buyout, including a project with the United States Post Office that had resulted in the sale of a machine.
 
 
 48
 Gay maintains that none of these other possibilities was as significant in size or as imminent as the Mexican project, and he insists that his lack of interest in them is therefore irrelevant in determining the materiality of the Kodak deal. In so arguing, however, Gay presumes that the Mexican project was so developed before December 20th that it obviously was distinguishable from PCSI's other opportunities. The district court, in rejecting Sobieski's testimony and crediting defendants', found to the contrary.
 
 
 49
 In our view, the evidence indicating that Campbell's bid on behalf of PCSI was a long-shot, together with Gay's explicit testimony that he was uninterested in "incipient business ideas," supports the district court's finding that disclosure of what defendants knew about the Mexican project as of December 20th would not have "alter[ed] the 'total mix' of facts available to the investor," Milton, 961 F.2d at 969 (emphasis omitted). This is enough to foreclose us from finding that the court clearly erred. We therefore affirm its judgment on the 10(b) claim.
 
 IV. Fiduciary Duty Claim
 
 50
 Gay argues that, even if the district court properly found that defendants were not required to disclose the Mexican project under Rule 10b-5, they still may be found responsible for violating state fiduciary duty standards. He contends that the burden of disclosure for fiduciaries under Massachusetts law is greater than that imposed by federal securities law.
 
 
 51
 Gay relies heavily on Donahue v. Rodd Electrotype Co. of New England, 367 Mass. 578, 328 N.E.2d 505 (1975), in which the Massachusetts Supreme Judicial Court quoted language from an opinion by Justice Cardozo describing the standard of behavior among partners in a joint venture as "[n]ot honesty alone, but the punctilio of an honor the most sensitive." 367 Mass. at 594. See also Wartski v. Bedford, 926 F.2d 11, 13 (1st Cir. 1991) (quoting Donahue ). Gay maintains that, under the "punctilio of honor" standard, whatever information defendants had about the Mexican project should have been disclosed in advance of the stock closing.
 
 
 52
 We cannot agree. The basic fiduciary requirement under Massachusetts law is that business partners and stockholders in close corporations refrain from acting out of "avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation," Donahue, 367 Mass. at 593; 328 N.E.2d at 515. In quoting Cardozo's language, the SJC in Donahue simply was restating this strict good faith standard and distinguishing it from what the SJC viewed as the lesser standard of "good faith and inherent fairness" to which directors and stockholders must adhere in the normal discharge of their responsibilities.[7]
 
 
 53
 We see nothing to be gained from discussing, as a categorical matter, whether the Massachusetts fiduciary duty standard requires greater disclosure than Rule 10b-5. But see Sugarman v. Sugarman, 797 F.2d 3, 8 (1st Cir. 1986) ("Majority shareholders ... must fully disclose all the material facts and circumstances surrounding or affecting a proposed transaction.") (emphasis added); Pavlidis v. New England Patriots Football Club, 675 F. Supp. 696, 698 (D. Mass. 1987) ("The fiduciary duty imposed on a majority shareholder under Massachusetts law is to disclose material information.") (citing Sugarman ). It suffices to say that, in this case, the district court did not err in rejecting Gay's fiduciary duty claim.
 
 
 54
 The record fails to demonstrate that defendants took actions to benefit themselves without regard for, or in spite of, their obligation of loyalty to Gay. The court permissibly found that it did not occur to them to discuss the Mexico project simply because of their good faith belief that the project was not a realistic opportunity for PCSI. It further found that Gay was not in a disadvantaged position vis-a-vis the defendants because, as president and majority shareholder of PCSI, he had "every opportunity to look after his own interests." Defendants had neither superior business knowledge nor more substantial experience than Gay, a well educated businessman who was advised throughout the negotiations process by a lawyer and accountant.[8]
 
 
 55
 In short, Gay has failed to prove a violation of the standard of "utmost good faith and loyalty," Donahue, 367 Mass. at 593. We consequently find no error in the district court's ruling on the fiduciary duty claim, and for similar reasons, endorse the judgment for defendants on Gay's claim under Mass. Gen. Laws Ann. ch. 93A.
 
 
 56
 Affirmed.
 
 
 
 [1]
 These machines are used for printing on plastic cards
 
 
 [2]
 Sobieski testified that he had been instructed not to tell Gay anything about the Mexican project because "there was [a] lot of money for all to be made in this deal ... [a]nd he no longer was a part of the company." He also claimed to have been told to take various security measures to limit Gay's access to the PCSI office and warehouse space, such as fixing window blinds so that Gay could not see in and keeping certain doors locked "in case of an unannounced visit." Sobieski was fired from PCSI in 1991 because of insubordination and poor job performance
 
 
 [3]
 Indeed, it is not clear that the court actually viewed the facts contested by Gay as having been found before trial. The court at one point described broadly the matters that needed to be explored at trial:
 Motions for summary judgment ... were denied because there was an issue of fact; that is, what Mr. Gay knew and when did he know it and who told him, and what Mr. Axline and others knew and what they concealed from Mr. Gay, if they did, and the role that Mr. Sobieski plays in this case.
 The judge later noted that it was unnecessary to hear testimony on the background facts concerning Gay's founding of PCSI and his relationship with the company because "[w]e all know that. That was undisputed." He went on:
 The question now is what happened in November and December of 1990, what was concealed from Mr. Gay by Axline and others, and what they said to Mr. Sobieski about his role.
 
 
 [4]
 Gay has not identified any testimony or other evidence on these issues that he was barred from presenting as a result of the district court's pretrial order. Indeed, at the opening of the trial, Gay's attorney noted his view that, despite the pretrial order, he viewed the major issues as controverted and therefore sought to introduce all of his proposed 25 exhibits into evidence. The court allowed all the exhibits, reserving ruling on their credibility, relevance and weight
 
 
 [5]
 At the end of his pretrial memorandum, following the list of exhibits to be introduced at trial, Gay noted that the document was filed in accordance with footnote two of the district court's amended pretrial order. He then stated: "Plaintiff objects to the ruling in said footnote and reserves his rights with respect thereto." A similar statement was made in another memorandum filed with the court before trial
 
 
 [6]
 Gay cites language from SEC. v. McDonald, 699 F.2d 47, 50 (1st Cir. 1983), to the effect that "[a] 'reasonable, if speculative, investor' would consider information indicating even the possible occurrence of an event of magnitude to be important." This statement did not mean that a major event would be deemed material within the meaning of Rule 10b-5 even if wholly improbable. In McDonald, the probability was strong that the relevant event would take place, see id. at 49, and the court's finding was that "the future event was sufficiently large to remain material even discounting for whatever uncertainty may be thought to have existed." Id. at 50
 
 
 [7]
 In fact, the full Cardozo quotation in Donahue more clearly reflects the distinction being made between simple "honesty" and fiduciary duty:
 Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary duties.... Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.
 
 
 [367]
 Mass. at 594 (quoting Meinhard v. Salmon, 249 N.Y. 458, 463-64 (1928))
 
 
 [8]
 We are unpersuaded by Gay's argument that he was at a disadvantage because all of the information about the Mexican project was channeled through FIMA USA, not PCSI. PCSI's machines were the target of Campbell's inquiry, and there is no basis for concluding that he would have been outside the loop had he stayed abreast of recent company activity either through inquiry or visits to the office