In re PARAMETRIC TECHNOLOGY CORPORATION SECURITIES LITIGATION

No.  CIV.A. 98–11328–GAO.

United States District Court,
D. Massachusetts.

March 29, 2001.

208

Glen DeValerio, Jeffrey C. Block, Michael T. Matraia, Berman DeValerio Pease Tabacco Burt & Pucillo, Nancy F. Gans, Moulton & Gans, PC, Thomas G. Shapiro, Shapiro, Haber & Urmy, LLP Mark C. Rosenthal, Palmer & Dodge, LLP, David L. Kelston, Adkins, Kelston, Zavez, PC, Boston, MA, for Consolidated Plaintiffs.

Glen DeValerio, Berman DeValerio Pease Tabacco Burt & Pucillo, Boston, MA, Mel Lifshitz, Sandy A. Liebhard, Stanley D. Bernstein, Bernstein Liehard & Lifshitz,LLP, New York, NY, for Plaintiff.

Kerry L. Konrad, Simpson, Thacher & Bartlett, New York, NY, for Consolidated Defendants.

Francis C. Lynch, Palmer & Dodge, LLP, Boston, MA, Henry B. Gutman, Simpson, Thacher & Bartlett, New York, NY, for Defendants.

### MEMORANDUM AND ORDER

O'TOOLE, District Judge.

This is an action alleging securities fraud under Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and 78t–1, and Rule 10b–5 of the Securities and Exchange Commission ("Exchange Act"), 17 C.F.R. § 240.10b–5. The plaintiffs purchased shares of the common stock of Parametric Technology Corporation ("Parametric" or "the Company") between April 16, 1998, and July 1, 1998, a period roughly corresponding to the third quarter of Parametric's 1998 fiscal year. The stock, which is publicly traded on the NASDAQ exchange, was selling at $34–15/16 at the close of business on April 16, but had fallen to $16–1/16 as of the close of business on July 2. In brief, the plaintiffs allege that the defendants fraudulently withheld material information about the Company's operations during the third quarter, causing the stock price to be artificially buoyed throughout the quarter until the Company's disclosure, on July 1, that consensus estimates of third quarter revenue and earnings per share would not be met. The announcement caused the stock price to fall substantially, to the plaintiffs' detriment.

The defendants have moved, pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b) and the Pri-

vate Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b)(3)(A), to dismiss the amended complaint as to all named defendants. For the reasons set forth herein, the motion is GRANTED.

## I. *The Allegations of the Amended Complaint*

Founded in 1985, Parametric is a leading supplier of mechanical computer-aided design ("MCAD") software. (Amended Compl. ¶ 18.) For ten years prior to the fiscal year quarter that ended July 4, 1998, Parametric had experienced forty consecutive quarters of improved sales and operating profits. (*Id.* ¶ 43.) On April 16, 1998, Parametric publicly reported financial results for the second quarter of fiscal 1998, which ended April 4. The Company reported software revenue of $264.1 million for the quarter, compared with $249.6 million for the same quarter in 1997 (*Id.* ¶ 45.), and pro forma earnings per share of $0.24, compared with $0.14 for the second quarter of 1997. (Defs.' App. Ex. 1.)

Parametric announced the results in a company press release issued April 16, and three of its officers, Chairman and CEO Steven C. Walske, President and COO C. Richard Harrison, and Executive Vice President, Treasurer and CFO Edwin J. Gillis, all defendants, conducted a conference call with analysts that same day. (Amended Compl. ¶ 51.) A transcript of the conference was made. (Defs.' App. Ex. 2.)

In the course of the conference call, Gillis, referring to estimates previously made by analysts said:

[W]e're standing by the range of [F]irst [C]all estimates for the balance of the year, which on the revenue side for the third quarter I think ranges from about $293 to $300, and in the fourth quarter ranges from a low of $315 to a high of $335. On the earnings side, that's 26–27 cents per share in Q3, and 29–30 cents per share in Q4.[1] (Amended Compl. ¶ 51.)

Later in the same call, Gillis said:

At 26 cents, I've got Kim Kassals at Wessels, and I think I've got everybody else at 27 cents.... So that's what I'm looking at in terms of those estimates, and I think that, you know, what we're basically saying is I think that those are reasonable places to be. (*Id.* ¶ 52.)

Walske added:

I think that the standing by the revenue numbers I think is more meaningful than the profit numbers. If there's anything that this company has demonstrated over the years, it is an ability to turn revenues into profits. (*Id.*)

Walske also responded to a question from an analyst about competitive pressure on Parametric to lower its selling prices because another seller had been offering deep discounts:

The fact that they announced it is not surprising because that's the way [Dassault][2] likes to do things. They have been discounting their software at substantially higher levels than you even indicate here for years now. And it's a function of a very weak modeling solution that they offer into the marketplace that they need to discount pretty sub-

---

1. The quotation as set forth in the amended complaint, and as reproduced here, differs slightly from the text of the transcript presented by the defendants (Defs.' App. Ex. 2.), but the differences are minor and immaterial. For example, the amended complaint puts "$" before the figures 315 and 335, while the

defendants' transcript does not. Neither version puts the word "million" after any of the revenue figures, though that is clearly what the speaker intended to convey.

2. Dassault Systemes, S.A. a European competitor of Parametric.

stantially in order to get any business out of it. But I would go farther to say that their approach to a lot of our large CV[3] accounts has been to discount the modeling software at 100% to try to turn them into service accounts for themselves, and basically get the infrastructure going in their direction from a modeling standpoint at no cost to the customer. And as a matter of fact with conversion costs at no cost to the customer. And you can imagine in particular the two large French accounts that they've been after in that respect. And they have not had any success at that level there. So again I think it's more a reflection of their competitive position than it is of any secular trends in the marketplace today. (*Id.* ¶ 53.)

The plaintiffs allege that at the time these statements were made, Parametric's officers knew that the Company "was experiencing serious problems that undermined its ability to attain growth in line with public expectations" (*Id.* ¶ 43), and that "the Company was, in reality, experiencing a significant downturn in business and increasing competition from market participants.... Although these trends were apparent and known to defendants by April 1998 at the latest, defendants actively concealed these trends and business downturn, and continued to portray Parametric in highly positive terms as a prospering company...." (*Id.* ¶ 44.) In particular, the plaintiffs allege that the defendants knew that Parametric had begun to experience weakening demand and declining sales for some of its core products. Moreover, faced with increased competition, the Company had to reduce its prices for some of its core products. Parametric was also preparing to launch a new product, named "Windchill," and had shifted a significant portion of its sales force away from its core products to the promotion of Windchill. Further, "the Company was experiencing a dramatic lengthening of the sales cycle," which presaged a further decline in revenues. (*Id.* ¶ 43(c).)

About two weeks after the conference call with analysts, the plaintiffs allege that Gillis made a presentation at a technology conference sponsored by the investment firm Hambrecht & Quist, in which he said:

> We continue to believe that we are very well positioned for growth and again many of you have seen this slide[4] in the past. What I like to try to illustrate in the slide is kind of two things. One is the components that make up the market; and the second is the kind of absolute size of the market. This is denominated in units. If you put dollars around it, the market size is about $3½ billion. (*Id.* ¶ 62.)

In response to a question about pricing trends, he said:

> Interestingly, our average selling price has been gradually increasing. This last quarter is about 19½ thousand dollars.[5] I think if you went back, probably 2½ years ago, it was 17.5. (*Id.*)

The plaintiffs claim that the defendants intended such public statements to convince the market that Parametric's third quarter performance would match analysts' projections, though the defendants themselves knew that the Company's actu-

---

**3.** "CV" is an abbreviation for Computervision, Inc., which had recently been merged into Parametric as the result of an acquisition.

**4.** He was apparently referring to a visual demonstrative aid.

**5.** In the April 16 conference call, Gillis had said that the "[a]verage selling price for the quarter was also flat at $19,200 per seat. And again that was much the same as last quarter." (Defs.' App. Ex. 2 at 4.)

al performance would be substantially short of those projections. In addition to these statements in April, the plaintiffs assert that the defendants employed several other public announcements to assist the deception. They contend that Parametric failed to disclose the alleged "negative trends" in its quarterly report, Form 10–Q, filed with the Securities & Exchange Commission (the "SEC") on May 18, 1998. (*Id.* ¶¶ 67, 87.) They also point to a story carried on May 28, 1998, in *The New Straits Times,* a Singapore newspaper, that reported that "Parametric expects more revenue growth opportunities in Asia in the coming years." (*Id.* ¶ 69.) In June the Company announced three substantial sales, each exceeding $1 million, which the plaintiffs say helped create a false impression that Parametric was experiencing robust sales in general. (*Id.*)

Nonetheless, as the quarter neared its end, at least one analyst began to have misgivings about the projections. A research note issued by an analyst at Goldman Sachs & Co. on June 26 announced that Goldman Sachs was lowering its third quarter revenue estimate for Parametric to $292 million from $300 million. (*Id.* ¶¶ 4, 71.) Reasons given for the revision included Parametric's shifting of sales force personnel to large accounts and to the promotion of Windchill and poor sales of the Company's products in Japan. (*Id.* ¶ 71.) The market reacted to the Goldman Sachs announcement, and Parametric stock fell $ 4⅝ or 13% on June 26. (*Id.* ¶ 72.)

That same day, Dow Jones Newswires carried an article that quoted the defendant John Hudson, Parametric's Vice President of Investor Relations:

> Parametric Technology's vice president of investor relations, John Hudson, said the market is overreacting to Goldman Sachs analyst Conigliaro's reduced revenue estimate.

Hudson noted that Conigliaro's previous revenue estimates were at the high end of analysts' revenue range of $293 million to $300 million.

> "An $8 million revenue adjustment is not a huge amount," Hudson said, adding that the company remains on Goldman Sachs' recommended list.

> "We're working towards the numbers that are out there," he said.

(*Id.* ¶¶ 73, 75.)

June 26, the day Hudson's comments were published, was a Friday; the third quarter closed as of the following Saturday, July 4. After the market had closed on Wednesday, July 1, with two business days remaining in the quarter, the Company issued a press release announcing that it anticipated that results for the third quarter ending July 4, 1998, would be approximately 15% below analyst expectations. (Defs.' App. Ex. 4.) In the press release, Walske was quoted as saying:

> At this point, it seems clear that the shortfall is due in part to transitional issues from two major sales force initiatives we have underway: the introduction of our new Windchill enterprise product data management technology and out shift in focus to providing increased support and attention to our major accounts. Both initiatives offer long-term opportunities, but have created some short-term difficulties in our performance and execution. In addition, we continue to experience weakness in the Asian markets. (*Id.*)

Many analysts were surprised by Parametric's announcement. One seemed to interpret Walske's remarks as hinting that Parametric's core "MCAD business [was] not likely to be a real growth business for the [C]ompany." (Amended Compl. ¶ 83.) On July 2, the stock price fell $8.75 or 35% to close at $16–1/16. (*Id.* ¶ 81.)

The plaintiffs purchased shares of Parametric on the market between April 16

and July 1. Although their claims are formulated as a class action, the issue of class certification has not yet been addressed; the plaintiffs identify the period between April 16 and July 1 as the putative "class period."

## II. *Pleading Standards for Judging the Sufficiency of the Amended Complaint*

The plaintiffs' chief substantive claim is that the defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b–5. To state a claim under these provisions, "a plaintiff must plead, with sufficient particularity, that the defendant made a false statement or omitted a material fact, with the requisite scienter, and that the plaintiff's reliance on this statement or omission caused the plaintiff's injury." *Gross v. Summa Four, Inc.*, 93 F.3d 987, 992 (1st Cir.1996); *see also Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216–17 (1st Cir.1996). For purposes of deciding the present motion, the key questions are whether the amended complaint sufficiently alleges an actionable failure by the defendants to disclose material facts and whether any such failure was accompanied by the requisite scienter.

Some bedrock principles may be recalled: First, a company's obligation to disclose material nonpublic information arises from a duty imposed by law, and in the absence of such a duty, a publicly traded company does not have a general obligation to disclose internal information, even if investors might think it material to understanding the company's financial position. Neither Section 10(b) of the Exchange Act nor Rule 10b–5 itself imposes an affirmative duty of disclosure. *Gross,* 93 F.3d at 992.

Second, a fact is considered *material* if a reasonable investor would regard the fact "as ... significantly alter[ing] the total mix of information made available." *Basic Inc. v. Levinson,* 485 U.S. 224, 232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (citations and internal quotations omitted). Whether the failure to disclose certain information can be considered materially misleading must be judged in context. *See Shaw,* 82 F.3d at 1212–13.

Third, the "required state of mind" for liability, *see* 15 U.S.C. § 78u–4(b)(2), generally referred to as *scienter,* is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 194 (1st Cir.1999) (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)).

In addition to these principles relating to the substance of the causes of action, the PSLRA has imposed pleading requirements that supplement the generally applicable pleading rules set out in the Federal Rules of Civil Procedure. Under the PSLRA, "any complaint alleging that a statement or omission is misleading must:

1. specify each statement alleged to have been misleading,

2. [specify] the reason or reasons why the statement is misleading,

3. and, if an allegation regarding the statement or omission is made on information and belief, ... state with particularity all facts on which that belief is formed."

*Greebel,* 194 F.3d at 193 (quoting 15 U.S.C. § 78u–4(b)(1)(alteration in original)).[6]

---

**6.** The plaintiffs assert that the complaint is not made on information and belief, but rather is based on facts unearthed after investigation by their attorneys. To the extent this is an assertion that the attorneys' information and belief is acceptable where the parties' is not, the argument is sophistical quibbling. What the PSLRA requires is reference to identified factual sources or bases for the complaint's allegations.

This requirement essentially echoes the requirement of Fed.R.Civ.P. 9(b), as interpreted in this Circuit, that fraud be pled with particularity. *Id.* Significantly for the present case, the PSLRA also requires plaintiffs relying on circumstantial inference to prove scienter to plead facts sufficient to justify a *strong* inference. An inference that is "mere[ly] reasonable," but not "strong," is insufficient to survive a motion to dismiss. *Id.* at 196.

### III. *Statement–by–Statement Analysis*

Evaluation of the defendants' motion requires a "statement-by-statement" analysis of the statements alleged by the plaintiffs to have been fraudulent. *In re Boston Tech., Inc. Secs. Litigation*, 8 F.Supp.2d 43, 55 (D.Mass.1998). Some of the statements relied on by the plaintiffs here are closely related, however, and may be grouped together for consideration without diminishing the individualized attention needed to be given to each.

### A. The SEC Filings

■ The plaintiffs allege that the defendants "concealed" information "which, because of SEC regulations, rules of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed to the investing public." (Amended Compl. ¶ 87.) The amended complaint notes, for example, that Item 303 of Regulation S–K, 17 C.F.R. § 229.303(a), requires management of a public company to identify "any known trends or ... uncertainties" that are reasonably likely to have a material impact on, among other things, the company's operations. (Amended Compl. ¶ 87(a).)

On May 18, 1998, about halfway through the third quarter, Parametric filed a quarterly report, Form 10–Q, with the SEC. It is not entirely clear from the Amended Complaint whether the plaintiffs mean to assert that the defendants should be held liable on the basis of the alleged omission of material disclosures from the 10–Q, or whether they point to the SEC filing instead simply as a background against which the misleading quality of the pleaded statements can be seen, or as support for their "fraud on the market" theory of liability, or as a basis for adjudging some of the individual defendants liable for insider trading. For present purposes, the allegations are treated as asserting an independent basis for liability. So understood, the allegations are insufficient to state a claim upon which relief can be granted for two principal reasons.

First, the factual allegations of the amended complaint, taken as true, are not sufficiently particular to support a conclusion that the defendants omitted material information about the Company's performance from the May 18 10–Q. Plainly, the 10–Q did not refer to some of the specific factors the plaintiffs say informed the defendants that revenue projections were too high. There is, for example, no specific discussion of internal sales reports or projections, or of plans for redeployment of a portion of the sales force, or of any lengthening of the sales cycle, which are some of the factors on which the plaintiffs base their assertion that the defendants purposely withheld material information. In the context of the full discussion of "Results of Operations" contained in the 10–Q,[7] however, the absence of such details was not a material omission.

In that discussion, the 10–Q says, among other things:

---

7. The full text of the Form 10–Q, filed May 18, 1998, is in the record. (Defs' App. Ex. 12.) Since the amended complaint refers to the document, it is appropriate on a motion to dismiss for the Court to consider any part of it, even parts not relied on by the plaintiffs. *Shaw*, 82 F.3d at 1220.

The increase in total software revenue during the three and six-month periods ended April 4, 1998 reflects the continued demand for the Company's products and services among both existing customers and first-time buyers, and the Company's ongoing investment in the expansion of its worldwide direct sales force.

(Defs' App. Ex. 12 at 9.) The plaintiffs do not contend that this affirmative statement, so far as it reports historical facts, was false. Still, taken by itself and construed favorably to the plaintiffs, it could be interpreted as an assurance that revenue growth would continue to grow as it had in the recent past.[8] The quoted statement was not made by itself, however, but was part of an extended discussion of the Company's business, which discussion included cautions against the blithe assumption that the future performance would track past performance, such as:

License revenue, which is derived from the sale of the Company's software products, ... decreased 4% for the second quarter of fiscal 1998 but increased slightly on a year-to-date basis.... The decrease in license revenue ... for the three month period is due to continued weakness in the Company's operations in the Asia Pacific region and the inclusion of the results of Computervisions's performance, which declined over the reported periods. (*Id.*)

. . . .

The Company anticipates that total software revenue will increase during the remainder of 1998 and expects to begin shipping its new Windchill product line, web-based technology in the area of enterprise information, in late June 1998. However, the rate of continued software revenue growth in the remainder of fiscal 1998 depends upon the Company's ability to successfully generate and fill current software license orders, effectively implement the measures taken to strengthen results in Japan, adequately manage exposure to foreign currency movements, attract and retain skilled personnel, and deliver timely product enhancements. Additionally, performance during the remainder of fiscal 1998 could also be affected by the efforts to integrate Computervision's operations with those of the Company, the success of those integration efforts, the timely introduction of the new Windchill product and its market acceptance and the ongoing economic uncertainties in the Asia Pacific region. Also, there can be no assurance that the quarterly software revenue growth rates in general or for particular geographical areas will be comparable to those achieved in prior periods. (*Id.* at 10.)

To the extent that the earlier quoted statement about revenues in prior periods could be understood as implying an assurance that revenues would continue to grow, the latter quoted portion of the 10–Q discussion plainly discouraged any such implication: "[T]here can be no assurance that quarterly software revenue growth rates in general ... will be comparable to those achieved in prior periods." (*Id.*) Moreover, the discussion identified some particular risks to the achievement of revenue goals, including softness in Asian markets and the uncertainties attendant upon the introduction of a new product, as well as some inevitable business concerns, such as "the Company's ability to successfully generate and fill current software license orders, ... attract and retain skilled per-

---

8. *But see, Shaw,* 82 F.3d at 1202 ("Equally settled is that accurate reports of past successes do not themselves give rise to a duty to inform the market whenever present circumstances suggest that the future may bring a turn for the worse.").

sonnel, and deliver timely product enhancements." (*Id.*)

The plaintiffs' theory rests on there having been a fraud on the market, which the defendants accomplished by fooling the analysts into sticking with their revenue and earnings projections for the third quarter. It may be assumed in the plaintiffs' favor that a company may be held liable for securities fraud that resulted from the market's reliance on analysts' predictions that were unduly optimistic because of statements or omissions by the company. *See Suna v. Bailey Corp.*, 107 F.3d 64, 72–73 (1st Cir.1997) (noting that the question whether companies may be liable for analysts' projections has not yet been decided in the First Circuit). Nevertheless, since the theory depends on the assertion that the Company misled the analysts, rather than the plaintiffs directly, the test of materiality obviously must be applied to the communications between the Company and the analysts.

As a general matter, it might be supposed that more information is usually better than less.[9] However, that instinct does not lead inexorably to a conclusion that any particular undisclosed information must have been "material" in the necessary sense. In other words, showing nondisclosure does not by itself establish materiality. "The mere fact that an investor [here, analyst] might find information interesting or desirable is not sufficient to satisfy the materiality requirement. Rather, information is 'material' only if its disclosure would alter the '*total mix*' of facts available to the investor [again, analyst] and 'if there is a *substantial likelihood* that a reasonable shareholder [analyst] would consider it important' to the investment decision." *Milton v. Van Dorn Co.*, 961 F.2d 965, 969 (1st Cir.1992) (emphasis in original)(quoting *Basic, Inc.*, 485 U.S. at 231–32, 108 S.Ct. 978); *see also, Shaw*, 82 F.3d at 1218–19.

The plaintiffs' contention is that there were undisclosed reasons for caution about quarterly sales revenues in addition to those reasons for caution that were identified and discussed in the 10–Q. To fulfill the heightened pleading requirement imposed by Fed.R.Civ.P. 9(b) and the PSLRA, the plaintiffs need to be specific. In the present context, where some cautions were given but the plaintiffs complain that additional cautions should also have been given, at the very least the plaintiffs must articulate specific facts that would show how the omitted information would have "significantly altered" the "total mix" of information available to analysts as they formulated their projections.[10] Because the amended complaint does not do so, the plaintiffs have failed to plead the essential element of materiality with sufficient particularity.

---

**9.** On the other hand, an "overabundance of information" is not necessarily an unmitigated good. There is some danger that a company's management might be led "simply to bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking." *Basic Inc.*, 485 U.S. at 231, 108 S.Ct. 978.

**10.** Because they must address the "total mix of facts available," the plaintiffs must allege that the information was not disclosed to analysts not just on the precise occasions referred to in the amended complaint, but at any rele-

vant time. There is a difference between alleging that a fact was not disclosed on a particular occasion and alleging that it was not disclosed at all. In this connection, it is interesting to note that when Goldman Sachs revised its estimates on June 26, it referred to one factor—sales force redeployment—that the plaintiffs say had been withheld by the defendants from the market. If that information had not been disclosed at all, as opposed to not having been disclosed in the ways and at the times that the plaintiffs isolate for scrutiny, how did Goldman Sachs know about the redeployment?

■ The second major reason any claim based on the SEC filing cannot succeed is that the amended complaint fails to allege that any of the defendants acted with culpable scienter in omitting any material information from the 10–Q. As noted above, the PSLRA has raised the pleading burden for a plaintiff as to the element of scienter. It is perhaps possible to imagine a case where fraudulent intent could be proved by direct evidence, but in most cases proof of a state of mind such as scienter is accomplished by inferences drawn from circumstantial evidence. Where, as here, the resort is to circumstantial evidence, the pleaded facts must support a "strong inference" that the defendants acted with the requisite fraudulent intent. *Greebel*, 194 F.3d at 195–96.

As to the 10–Q, the pleaded facts are not sufficient to justify such an inference. In the first place, there is a link between scienter and materiality. The more material the omission, the more it might be thought to have been purposefully motivated by an intent to deceive. Conversely, the omission of a relatively immaterial fact might well have been done precisely because it was immaterial. So failure to plead sufficiently the materiality of the omitted information goes a long way toward dooming an assertion that the omission was intended to deceive.

More importantly, the general allegations about what the defendants knew but did not disclose do not support a strong inference that their failure to disclose that information was the result of an intent to deceive. The plaintiffs plead that the defendants had information that the Company's sales were not meeting projections, and that they knew other things that suggested why there might be some falloff in sales. Beyond those general assertions, however, probative specifics are lacking. Significantly, the amended complaint does not attempt to quantify any alleged falloff from projections (*See* Amended Compl. ¶ 84.) How big the falloff was—how big the defendants knew it to be—is obviously crucial. Taken at face value, the allegations are just as consistent with the conclusion that the internally available information indicated to the defendants only that revenues would be at the low end of the analysts' ranges rather than the high end. The allegations do not justify the inference that the internal information showed the results would be significantly, i.e., materially, below the lower end of the range. With the allegations thus equivocal, the plaintiffs have not fulfilled their burden to plead specifically that the internal sales information showed a falloff of a magnitude sufficient to justify an inference that the withholding of the internally known information was done with intent to deceive.

Furthermore, it was public knowledge (certainly available to analysts) that the rhythms of Parametric's business were such that sales revenues tended to be booked late in each quarter. In Parametric's annual report, Form 10–K, filed with the SEC in November 1997, well before the current controversy or even the revenue downturn that the plaintiffs point to, the Company noted:

> While the Company's sales cycle varies substantially from customer to customer, a high percentage of the Company's revenues are expected to be realized in the third month of each fiscal quarter and tend to be concentrated in the latter half of that month. The Company's orders early in a quarter will not generally be large enough to assure that it will meet its revenue targets for any particular quarter. In addition, the Company's operating expenses are based on expected future revenue and are relatively fixed for the short term. Accordingly, the Company's quarterly results may be difficult to predict until the end of the

quarter and a shortfall in shipments or contract orders at the end of any particular quarter may cause the results for that quarter to fall short of anticipated levels. In turn, this could adversely impact the market price of the Company's stock.

(Defs.' App. Ex. 3 at 28.) The plaintiffs do not contend that this statement is an inaccurate description of Parametric's business experience, nor do they contend that the analysts were unaware of these facts. It falls to the plaintiffs to plead facts sufficient to raise a strong inference that whatever falloff was perceived in mid-quarter led the defendants to believe that analysts' estimates for the full quarter were materially off the mark and, believing that, to say nothing more in the 10–Q to discourage reliance on them. But the allegations to support such a strong inference are lacking.

The plaintiffs argue that the inference of scienter is supported by the fact that individual defendants were selling their own Parametric stock during the Spring of 1998 at levels substantially higher than in the previous eight months. "Unusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter." *Greebel*, 194 F.3d at 197. However, the "mere pleading of insider trading, without regard to either context or the strength of the inferences to be drawn, is not enough.... At a minimum, the trading must be in a context where defendants have incentives to withhold material, non-public information, and it must be unusual, well beyond the normal patterns of trading by those defendants." *Id.* at 198.

The plaintiffs must plead facts which would warrant, first, a finding that there was a suspiciously abnormal or unusual pattern of trading, and second, an inference of scienter from that finding. The plaintiffs fail in the second part of the burden because they fail in the first. Comparison of trades by Parametric insiders during the third quarter of 1998 with trades during the eight months prior to April 1998 might support an inference of "suspicious" trading if, other things being equal or at least similar, there were no other plausible explanation for any difference. But, as the defendants point out, during most of the eight months prior to April 1998, insiders were prohibited from trading in Parametric stock by pertinent SEC rules and accounting principles, because of Parametric's acquisition of Computervision during that period. Under these circumstances, the plaintiffs' proposed inference is not permitted as a matter of logic, let alone as a matter of the applicable legal principle.

### B. The April 16 Press Release and Conference Call

■ As detailed above, the plaintiffs claim that the defendants made several statements on April 16 in conjunction with the issuance of news about Parametric's second quarter earnings that were misleading about what results might be expected in the third quarter. The Company's press release said, among other things:

> Looking ahead to the second half of fiscal 1998, we are cautious about the near-term outlook for Asia, but we continue to have confidence in the fundamental strength of our business and in our strong competitive position.[11]

(Amended Compl. ¶ 46.) The plaintiffs claim that, having made the quoted statement, the defendants were under the duty

---

11. In the Amended Complaint, this sentence is underlined. It may be inferred from the underlining that the plaintiffs mean to call attention to it as the significant part of the press release for purposes of their claims.

to disclose internal information that sales revenues were slacking, because without that unrevealed information, the statement about the Company's "confidence" in "the fundamental strength" of its business and its "strong competitive position" was materially misleading. The claim is insufficient as pleaded for several reasons.

First, the statement in the press release emphasized by the plaintiffs is nothing more substantial than expectable "corporate puffery." *Shaw*, 82 F.3d at 1218 ("[A] claim that a fraud was perpetrated on the *market* can draw no sustenance from allegations that defendants made overly-optimistic statements, if those statements are ones that any reasonable investor (ergo, the market) would easily recognize as nothing more than a kind of self-directed corporate puffery. The market is not so easily duped, even granted that individual investors sometimes are.") (emphasis in original). *See also, Suna*, 107 F.3d at 72 ("A reasonable purchaser would know that these statements consisted of optimistic predictions of future potential and would not have been misled by them.").

Second, the statement was plainly on its face a "forward-looking statement"[12] entitled to the "safe harbor" established by the PSLRA. *See* 15 U.S.C. § 78u-5(c). The press release contained a notice about forward-looking statements that comported with the requirement of the statute[13] and thus adequately invoked the protection from suit of the "safe harbor" provision. The press release included the following statement:

> Except for the historical information contained herein, matters discussed in this news release may constitute forward-looking statements that involve risks and uncertainties that could cause actual results to differ materially from those projected. These include risks and uncertainties that are detailed from time to time in reports filed by [Parametric] with the Securities and Exchange Commission, including the company's most recent reports on Form 10-K and 10-Q. In particular, the company's future results depend upon, among other factors, the level of future orders, market acceptance for the company's new Windchill product and weakness in the Asian economies, as well as the company's ability to continue to penetrate the mechanical segment of the CAD/CAM/CAE industry.

(Defs.' App. Ex. 4.) While the first part of this notice may be general boilerplate, the last sentence refers to specific factors that might affect Parametric's revenues in the third quarter of 1998. These were "mean-

---

**12.** A "forward-looking statement" is "(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items; (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer; (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission; (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C); (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or (F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission." 15 U.S.C. § 78u-5(i)(1).

**13.** A forward-looking statement finds "safe harbor" if it is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1).

ingful cautionary statements" sufficient to invoke the shelter of the safe harbor provision. *See* 15 U.S.C. § 78u–5(c)(1)(A)(i).

Third, for the same reasons that the plaintiffs have failed to plead facts sufficient to justify a strong inference of scienter with respect to the 10–Q, they have failed to plead facts that would support a strong inference that Walske, who was quoted in the press release as speaking on behalf of Parametric, omitted disclosing additional internal information with culpable scienter. Moreover, the defendants would be entitled to the safe harbor for any forward-looking statement "unless the maker of the statement had actual knowledge it was false or misleading." *Greebel*, 194 F.3d at 201 (citing 15 U.S.C. § 78u–5(c)(1)(B)). The facts pleaded about what Walske or other insiders knew are too general to permit an inference—even a merely reasonable one—that Walske had actual knowledge that his statement about the outlook for the balance of 1998 was either false or misleading.

In addition to the press release, Walske, Gillis and Harrison conducted a conference call on April 16 to discuss the second quarter results with analysts. The plaintiffs focus on statements made during the conference call by Walske and Gillis, quoted above, that indicated their agreement with third quarter revenue and earnings projections previously publicized by analysts. The plaintiffs allege that at the time these statements supporting the projections were made, the defendants knew [14] that internal sales and other information indicated that those results would not be achieved. Apart from conclusory allegations that the defendants knew or recklessly disregarded the fact that the analysts' projections were overstated, the plaintiffs

again have failed to plead facts sufficient to raise a "strong" inference of scienter.

The PSLRA's "safe harbor" also precludes liability for the comments made during the conference call. Gillis prefaced the defendants' remarks with the following caution about "forward-looking statements" according to the transcript of that call:

> Before we begin, let me repeat the obligatory safe harbor warning regarding forward-looking statements. Again, as usual, our discussions about the future obviously involve assumptions which may be incorrect. The various [risks] and uncertainties, which could impact our business are spelled out in our form 10Q's and 10K's with the SEC, which you can get from either us or directly from the SEC.

(Defs.' App. Ex 2 at 1.) The 1997 10–K, filed by the Company the previous November, not only repeated in a more formal way the general caution about forward-looking statements, but also identified a number of particular factors that might have an adverse affect on the actual results of operations. (*Id.* Ex. 3 at 28–30.)

These cautions were adequate to invoke the statutory safe harbor. The fact that the audience for the conference call remarks was a sophisticated one has a bearing on the adequacy of the cautions. They were likely familiar with Parametric's business cycles, but even if they had missed it on their own, they were directed by Gillis to the 1997 annual report's particular caution that Parametric typically realized sales revenues very late in a quarter. This pointedly brought to their attention that projections early in the quarter could be unreliable.

---

14. As an alternative to actual knowledge, the plaintiffs also allege that the defendants "recklessly disregarded" the foreboding information. (*See* Amended Compl. ¶ 32.) If suffi-ciently supported by particularized detail (which it is not), reckless disregard would be equivalent to knowledge and would support liability.

It was not necessary, as the plaintiffs contend, for the participants in the conference call to repeat the "safe harbor" caution before each utterance that contained a forward-looking statement, as the plaintiffs argue. Not only does the statute not require that—it plainly contemplates a more conversational, short-form version of the caution for oral, as opposed to written, comments, *see* 15 U.S.C. § 78u–5(c)(2)(A)(ii), (B)(i)-(ii)—but the proposal is almost silly. It would lead to stilted, artificial discussions that would be more ritualistic than enlightening, ultimately discouraging one result that the statute was aimed at promoting: intelligent, and intelligible, discussion of operations by management.

### C. The Hambrecht & Quist Conference

■ The plaintiffs allege that on April 28, 1998, Gillis made a presentation to a technology conference sponsored by Hambrecht & Quist that included two misleading statements, quoted above.[15] This first was that Parametric was "well positioned for growth." That statement is not actionable. It is nothing more than a "vaguely optimistic" statement, *Shaw*, 82 F.3d at 1218, the kind of "rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace." *Id.* at 1217.

The other statement was a simple assertion of fact about Parametric's average selling price during the second quarter. The plaintiffs do not allege that the fact stated was untrue, but rather that Gillis had information that the average sales price in the third quarter would be significantly lower, as Parametric responded to increasing competition for its core products, and that he had a duty to disclose the additional fact in order to prevent the in-

formation about the second quarter from being misleading.

Even if there was a duty to warn that the average price would drop in the next quarter, which may be problematic (*see supra* note 8, at 214), the difficulty for the plaintiffs is again that there are insufficient facts pleaded to support a strong inference of scienter. It would not be enough, for instance, that Gillis knew simply that Parametric had cut its price in some cases. The asserted fact related to the *average* sales price for the quarter, and Gillis's knowledge that there had been some sales below the second quarter average would necessarily not be inconsistent with a belief that the *average* sales price would continue to hold for the third quarter. The burden lay with the plaintiffs to allege facts that would permit a strong inference in favor of their claim that Gillis knew otherwise, but they have not done so.

### D. The June Sales Announcements

■ In June 1998, Parametric issued three separate announcements of significant sales. The plaintiffs allege that the sales announcements, unaccompanied by information about the Company's general sales performance, conveyed the misleading impression that Parametric was not facing revenue problems and was continuing its financial success.

Again, the plaintiffs do not say that the reports of new sales contracts were false. They rather assert, in effect, that such isolated reports of sales must be balanced by issuance of a contemporaneous review of whatever negative information might be necessary to prevent enthusiasts from extrapolating from the particular successes to general business success for the quarter. That proposition goes farther than

---

**15.** Unlike the April 16 conference call, there is no transcript for the Hambrecht & Quist conference, so the context of the statements is not available.

any statute or case to date have gone. There is no duty to disclose broader information; a company is not called upon to give a general business review whenever it accurately discloses a particular, discrete fact. *See Gross,* 93 F.3d at 992.

### E. *The New Straits Times* Article

As indicated above, on May 28, 1998, *The New Straits Times,* a Singapore newspaper, carried a story that attributed to a Parametric manager the statement that Parametric "expects more revenue growth in opportunities in Asia in the coming years." The plaintiffs cannot rely on that statement to support their claims.

In the first place, the statement is just a "vaguely optimistic" bit of "corporate puffery," *see Shaw,* 82 F.3d at 1218, and thus not actionable.

Moreover, it is not even inconsistent with weak third quarter 1998 results; it speaks of "coming years," as opposed to current periods. In fact, Parametric had given consistent warnings that Asian markets were a current problem. There are such cautions in the April 16 press release, the conference call with analysts of the same date, and the 10–Q filed in May. In context, the statement does not have any misleading quality.

Finally, as with the other statements discussed above, there is a woefully inadequate pleading of the requisite scienter.

### F. The Hudson Interview

■ Last, the plaintiffs rely upon a statement attributed to the defendant Hudson that was published by Dow Jones Newswires on Friday, June 26, 1998, just five business days before the end of the third quarter. Reacting to a negative research note issued by Goldman Sachs lowering its third quarter revenue estimate for Parametric from $300 million to $292 million, Hudson reportedly said:

An $8 million revenue adjustment is not a huge amount.... We're working towards the numbers that are out there. (*See* Amended Compl. ¶ 75.) Those comments could be understood as a reaffirmation of the analysts' projections. Significantly, the reaffirmation, if it was that, was made as the quarter was drawing to a close. The plaintiffs contend that, even accepting that Parametric typically realized sales revenues in the last two weeks of the quarter, Hudson knew when he made those comments that internal information indicated that Parametric would not make those numbers. More precisely, the plaintiffs say it may be inferred that Hudson knew that the estimates would not be achieved. (They do not allege that they have direct evidence that he knew, but rather that the circumstantial evidence warrants the inference that he did.)

The circumstances on which the inference rests are essentially these: The defendants received weekly sales reports and participated with sales personnel in weekly sales calls. On July 1, three business days after Hudson's comments, Parametric announced that it expected revenues to fall about 15% short of estimates. A couple of weeks later, Parametric announced third quarter results that indeed were substantially lower than what Hudson referred to as "the numbers that are out there." From these facts, the plaintiffs argue, it may be inferred that Hudson knew of the actual shortfall when he spoke on June 26. It may be a permissible inference. But is it a "strong" one, as required?

In *Shaw,* the Court of Appeals noted that "the short time frame between an allegedly fraudulent statement or omission and a later disclosure of inconsistent information does not, standing alone, provide a sufficient factual grounding to satisfy Rule 9(b)." *Shaw,* 82 F.3d at 1225. Considering temporal proximity along with other

probative factors, the Court of Appeals in that case concluded that the plaintiffs had satisfied the particularity requirement of Rule 9(b). Since the PSLRA did not apply to the complaint in *Shaw*, the court did not undertake to consider whether the inference of scienter was "strong" enough.

The cases to date have not offered guidance on how to distinguish a "strong" inference from a "merely reasonable" one, except to emphasize that the plaintiffs face a heightened pleading burden in order to survive a motion to dismiss. No strict definition of what constitutes a "strong" inference can be articulated for all cases, and each case must be adjudged on its peculiar facts. *See Greebel*, 194 F.3d at 197–98.

In the absence of firmer guidance, it might be considered that a "strong" inference stands in relation to a "reasonable" inference in roughly the same proportion that proof by clear and convincing evidence stands in relation to proof by a preponderance of the evidence. Courts have frequently described the heightened level of proof by "clear and convincing" evidence as requiring a showing that the fact in question is "highly probable." *See Colorado v. New Mexico*, 467 U.S. 310,

316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984); *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 830 (Fed.Cir.1991); *Fike Corp. v. United States*, 41 Fed. Cl. 776, 786 (1998). That standard seems adaptable to help decide when an inference is "merely reasonable" or is, rather, "strong." A "strong" inference would be one that, on the facts pleaded, seems "highly probable." [16]

▪ The facts the plaintiffs have pleaded do not support an inference that it was "highly probable" that Hudson's statements were made with the required "intent to deceive, manipulate, or defraud." *See Ernst & Ernst*, 425 U.S. at 193 n. 12, 96 S.Ct. 1375. The statement with the strongest tendency to reassure the market—"We're working towards the numbers that are out there"—could easily be understood as a statement that was literally true. It was a statement as much about effort as about expected results. He might have said instead, "We're trying." In that case, if the Company really was trying, and there is no reason to think otherwise, the statement was not false at all.

Having said "We're working towards the numbers that are out there," Hudson did

---

**16.** Two cautions: First, use of the analogy to a heightened burden of proof is not to be taken as a suggestion that a securities fraud plaintiff needs to prove scienter at trial by clear and convincing evidence. Many states do require a higher standard of proof for fraud, but that has not been the law in cases arising under the federal securities laws, and the PSLRA does not purport to change the burden of proof at trial. It does, however, plainly raise the pleading burden. The analogy to the heightened burden of proof is apt to the extent it helps characterize how the heightened pleading burden may relate to the "normal" pleading burden, as a heightened burden of proof relates to a "normal" one.

Second, it would be quixotic to try to define precisely "how high" above the "reasonable" inference the "strong" inference must be in every case. In describing the differences between burdens of proof, courts have not pretended to any greater precision than to say that point B (proof by clear and convincing evidence) is located somewhere above point A (proof by a preponderance of the evidence) and somewhere below point C (proof beyond a reasonable doubt). Similarly, addressing the heightened pleading standard for scienter imposed by PSLRA, one might say that point B (a "strong" inference) lies somewhere above point A (a "reasonable" inference) and somewhere below point C (the "smoking gun," *i.e.*, pleading not dependent on inference but on direct evidence of scienter). "Highly probable" works as a tool for approximating point B in the former context; it would seem to be just as serviceable in the latter.

not then say, "But we don't think we're going to get there." This seems to be the nub of the plaintiffs' claim as it relates to Hudson's remarks. It is essential to their claim that they set forth what would support the propositions (1) that the defendants knew on June 26 that they would not make the projections and (2) that Hudson intended to deceive the market by giving reassurance that they would, contrary to what the insiders knew.

But rather than relying on specific factual allegations about what the defendants knew about the prospects of success as of June 26, the plaintiffs depend instead on a kind of *res ipsa loquitur* rationale. They say: "[I]t is inconceivable that between Friday evening June 26, 1998 and Wednesday July 1, 1998, defendants learned for the first time that Parametric's expected revenues for the Third Quarter would be $50 million less than publicly expected." (Pls' Mem. in Oppos. to Defs.' Mot. to Dismiss, at 10.) In other words, the defendants *must have known* on June 26 what was disclosed on July 1.

As noted earlier, temporal proximity alone does not suffice to justify the inference. *See Shaw*, 82 F.3d at 1225. The other factual allegations the plaintiffs rely on to support an inference that the defendants knew projections were false as of June 26 are also insufficient. While there are general allegations that weekly sales reports showed declines, there are no specifics. Not only are there not details about what the sales reports showed, there is not even an allegation that sales reports showing declines were material to the current period, as opposed to prior periods. As the defendants point out, the amended complaint refers only to sales reports about the *second* quarter. (*See* Amended Compl. ¶ 43.) Were whatever declines that were evident of a magnitude great enough to tell the defendants that the actual results would be outside the range of the

analysts' estimates? Were the declines of the size or source that the defendants realized they would not be made up in the crucial last days of the quarter? The plaintiffs do not plead a specific factual basis for answering the critical question: What did the defendants know and when did they know it?

The other factual circumstance the plaintiffs rely upon to support an inference of scienter—sales by insiders of Parametric stock—does not help them, not only for the reasons described above, but also because, with respect to the June 26 statements in particular, there were no insider trades made in proximity to them.

The PSLRA goes against the grain of the notice pleading instincts lawyers have nurtured since the adoption of the Federal Rules of Civil Procedure. It is understandable that counsel for plaintiffs in securities cases are frustrated by the change in pleading standards worked by the PSLRA. It is likely—indeed even "highly probable"—that cases that would easily have survived a motion to dismiss under former standards will not survive under the PSLRA. That is no accident; both the plain language of the statute and its legislative history indicate that that result is exactly what Congress intended. And it is the result here.

## IV. *Individual Liability and Insider Trading*

Count II of the amended complaint alleges violations of Section 20(a) of the Exchange Act, which authorizes a cause of action against any individual who exerts direct or indirect control over a corporation that acts in violation of the securities laws. *See* 15 U.S.C. § 78t(a). The amended complaint alleges that the individual defendants "did influence and control, directly or indirectly, the decision-making of Parametric, including the content and dis-

semination of the various statements which plaintiffs contend are false and misleading." (Amended Compl. ¶ 102.) But where there is no liability under Section 10(b), it must follow that there is none under Section 20(a), regardless of an individual defendant's position or influence within a company. *See Suna*, 107 F.3d at 72–73; *In re Segue Software, Inc. Securities Litigation*, 106 F.Supp.2d 161, 172 (D.Mass.2000).

Count III of the Amended Complaint alleges violations of Section 20A of the Exchange Act. Section 20A provides a private right of action for securities law violations based on contemporaneous insider trading.[17] To state a claim under that statute, the plaintiff must show that a corporate insider traded in the company's stock while in possession of material nonpublic information. To establish an individual's liability under section 20A, the plaintiff must allege and prove a predicate violation of the Exchange Act. *See In re Advanta Corp. Secs. Litig.*, 180 F.3d 525, 541 (3d Cir.1999); *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir.1994). Here the plaintiffs depend on there having been a violation of Section 10(b). Since, as set forth above, their attempt to plead such a violation has been unsuccessful, they are necessarily unable to plead a claim for liability under Section 20A.

In the circumstances, it is not necessary to consider the defendants' other argument, that the plaintiffs may not recover simultaneously under both Section 10(b) and Section 20A.

17. "Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable... to any person who, contemporaneously with the purchase

## V. Conclusion

For the foregoing reasons, the defendants' motion to dismiss the amended complaint is GRANTED. The consolidated actions are dismissed with prejudice.

It is SO ORDERED.

or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class." 15 U.S.C. § 78t–1(a).